IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2025

**IN RE BENTLEY W.[1]**

**Appeal from the Court Juvenile Court for Grainger County**
**No. 2023-JV-18-TPR      Lane Wolfenbarger, Judge**

———————————————————

**No. E2024-01795-COA-R3-PT**

———————————————————

Mother appeals the termination of her parental rights. The trial court found two grounds for termination: abandonment by failure to visit and abandonment by failure to support. The trial court also concluded that terminating Mother's parental rights was in the child's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY, C.J., and VALERIE L. SMITH, J., joined.

Jordan Long, Tazewell, Tennessee, for the appellant, Emaleigh W.

Jonathan Skrmetti, Attorney General and Reporter; and Amber L. Barker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

This appeal concerns the termination of Emaleigh W.'s (Mother) parental rights as to Bentley W., who was two years old at the time of trial. The Juvenile Court of Grainger County found that the Tennessee Department of Children's Services (DCS) proved by clear and convincing evidence that Mother abandoned Bentley by failure to visit and by failure to support. The trial court also concluded that termination of Mother's parental rights is in Bentley's best interest. Accordingly, the trial court terminated Mother's parental rights.

---

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

In February of 2023, DCS received a referral alleging that Bentley was exposed to drugs and domestic violence while in Mother's care. Mother and her boyfriend, Landon Coldwell, were both named as perpetrators. According to the dependency and neglect petition, the initial referral identified Mr. Coldwell as Bentley's father; however, at the time, both Mother and Mr. Coldwell adamantly denied that Mr. Coldwell was his father. At trial, Mother stated that Mr. Coldwell is Bentley's father. No father is named, however, on Bentley's birth certificate, and the trial court found that Mr. Coldwell was not a putative father under the statutory requirements.[2]

DCS received an additional referral related to Bentley. This referral alleged a deficiency of supervision and environmental neglect. Law enforcement noted that Mother had left Bentley in the care of Mr. Coldwell, a registered sex offender, raising serious safety concerns. When DCS conducted a home visit, someone else was present and indicated that Mother was not home and that Bentley was with Mother. However, DCS was still present when Mother returned home, and Bentley was not with her. In response to an inquiry from DCS, Mother initially indicated Bentley was inside the home, but she later claimed he was with Allison Coldwell, Mr. Coldwell's sister, who had previously lost custody of her own children. When DCS contacted Ms. Coldwell, she informed DCS that Bentley was not with her either. During this home visit, Mother tested positive for THC and admitted to using marijuana. She also acknowledged that Mr. Coldwell had an upcoming court date for violation of the conditions of the sex offender registry.

In March, both Mother and Mr. Coldwell were arrested in connection with a domestic assault, which involved, in part, Mr. Coldwell allegedly hitting Mother with a car. A no-contact order was issued. Nevertheless, Mother was later observed together with Mr. Coldwell.

Bentley was removed from Mother's custody on March 24, 2023. At that time, he was five months old. Bentley was adjudicated dependent and neglected on the grounds of placement "in the care and custody of improper supervisors" and Mother's drug use. Bentley was placed into foster care and has lived since his removal with the same foster family. Mother was ordered to pay 60 dollars per month of child support. In September 2023, DCS established a permanency plan outlining multiple responsibilities for Mother, including, *inter alia*, providing gifts on holidays and birthdays, providing child support, providing food during visits, finding transportation to such visits, completing mental health and drug and alcohol assessments, finding a source of income, and obtaining safe and stable housing.

While Bentley was in foster care, Mother gave birth to another child, Kamdyn, by a different father. In June 2024, Kamdyn was removed from Mother's custody at four days

---

[2] This appeal solely addresses the trial court's decision to terminate Mother's parental rights as to Bentley.

old because he tested positive for THC at birth. Kamdyn was placed into the same foster family as Bentley. Mother's parental rights to Kamdyn were not at issue in the trial court, nor are Mother's parental rights as to Kamdyn at issue in this appeal.

Bentley and Mother have had several DCS case managers. Emileah Buffalo was Mother's case manager from January 2024 until May 22, 2024, which includes the entire statutory look-back period for determining abandonment under DCS's termination petition. Zach Maples took over for Ms. Buffalo at the end of May and was the case manager through the trial.

At trial, the court heard testimony from DCS case managers Ms. Buffalo and Mr. Maples, Bentley's foster mother (Foster Mother),[3] and Mother. The case managers testified that Bentley had "bonded with the foster parents," that "[h]e does very well" in the foster home, and that "he's very attached to" his foster parents. The case managers also testified that Mother visited Bentley twice for a total of approximately three hours over the 14 months between his removal and the filing of the petition for termination. For both visits, Mother neglected to bring essentials such as food for Bentley. The first visit was in September 2023 and lasted for about one hour. Ms. Buffalo testified that approximately five months later, on February 27, 2024, Mother asked if she could "have a visit with Bentley soon." However, due to a scheduled foster family vacation, that visit did not occur until March 18. This second visit lasted for two hours. Upon Mother's arrival for the visit, she tested positive for THC. Mother's permanency plan required that she "should not come to the visit under the influence of drugs or alcohol. If it is suspected that she is under the influence, the police will be called, and the visit will end immediately." Despite the positive drug test, DCS allowed the visit to proceed. At the time of this visit, Ms. Buffalo and Mother spoke about another visit and having a drug test, but Mother did not promptly move forward with the next visit or a drug test. After the March 18 visit, Mother did not attempt to set up another visit until more than a month had passed, at which point DCS again requested a drug screen. No subsequent visits occurred.

Ms. Buffalo testified that she tried to schedule a visit any time Mother reached out seeking to visit Bentley. Mother, however, canceled visits and was uncooperative with being drug tested. Whenever the topic of drug screens came up in communication with DCS, Mother would stop responding or provide varying excuses for why she could not make it for drug testing, ranging from transportation challenges, which DCS offered to assist with, to out-of-town trips. Mother also failed to engage in telephonic or online visitation. Mother never sent Bentley any birthday or holiday cards or presents. On some occasions, "it would be weeks or a month before" Ms. Buffalo heard from Mother.

While Bentley was in DCS custody, Mother also declined to provide DCS with the location of where she was residing. Mother told DCS at various times that she was

---

[3] Foster Mother and her husband also have three biological children.

homeless, living with a friend, living with her grandmother, or living with Kamdyn's father, a man who had been arrested for rape and aggravated assault. Mother was uncooperative and prevented DCS from visiting any of these residences.

On May 7, 2024, DCS filed a petition to terminate Mother's parental rights. Prior to DCS filing the termination petition, Mother did not participate in moving forward with fulfilling the requirements of her permanency plan.

Mr. Maples took over as the new case manager for Mother and Bentley at the end of May 2024. More than four months later, and shortly before trial, which was conducted on October 15, 2024, Mother provided Mr. Maples with a certificate of completion for an eight-week Non-Offender Domestic Violence Class. At trial, Mother testified that she also completed additional assessments and parenting classes about two months before trial. Other than a photo connected with her completion of the domestic violence course, DCS received no other proof that Mother completed any other portion of her permanency plan before trial, nor did Mother present any other evidence of completion at trial. Mother's testimony as to satisfying these other requirements lacked detail. Mother also asserted that she had quit using marijuana, claiming to have done so two or three weeks before trial.

Foster Mother testified that there were "a handful" of times where Mother was supposed to visit, but DCS could not reach Mother, or DCS went to pick Mother up and Mother was not there. Foster Mother also testified that Bentley does not appear to know his biological mother, calls his foster parents "mama" and "daddy," and has a strong bond with them. Furthermore, Foster Mother noted the March 18 visit with Mother was "hard" and "pretty traumatic" for Bentley, who was "fussy" the rest of the day and cried and reached for Foster Mother as he was handed off to Mother. Foster Mother expressed her family's love for Bentley and their desire to adopt him.

Mother was unemployed throughout the 19 months between Bentley's removal from her custody and trial. DCS referred Mother to a work placement agency, but Mother did not confirm whether she contacted that agency. Additionally, when Ms. Buffalo asked Mother for an address to try to assist Mother in finding nearby employment opportunities, Mother refused to provide that information. Mother testified that she contacted an employment agency but indicated that she declined every job opportunity the agency provided because she was, at that time, pregnant and "didn't want to work in a factory." Mother also testified that she was going to start working for a company; however, due to a failed drug test, the offer was revoked. Mother conceded that her marijuana usage interfered with her ability to work. When asked how she was able to afford to purchase marijuana, Mother indicated that she did so through the largesse of others, including getting money from her grandmother, who was unaware of the use of the funds.

While Mother failed to provide DCS with information about where she resided during the custodial period, she testified that she moved into a new apartment with her

grandmother a few weeks before trial, has a lease, has a bed for Bentley, has clothes for Bentley, and can meet the basic necessities of Bentley. She also stated that she has a job offer with her stepfather and brother out-of-state.

During the 19 months between Bentley being removed from Mother's custody and trial, Mother's payment of child support was inconsistent. Her payments of child support during this period are set forth in the table below:

| August 2, 2023 | 59 |
|---|---|
| December 5, 2023 | 65 |
| February 22, 2024 | 10 |
| April 9, 2024 | 10 |
| June 12, 2024 | 30 |
| July 30, 2024 | 20 |
| August 7, 2024 | 20 |

The trial court issued its decision terminating Mother's parental rights on November 6, 2024. Regarding the termination ground of abandonment by failure to visit, the trial court found as follows:

The relevant lookback period for this case is between the dates of February 7, 2024, to May 6, 2024. [Mother] visited one time during the relevant lookback period, on March 18, 2024. [Mother] was not incarcerated or incapacitated in any way, and she knew the child was in foster care. Moreover, she knew the consequences of her failure to visit the child because she signed the Criteria for Termination of Parental Rights ("TPR Criteria") in 2023 (Exhibit 5).

The trial court noted that Mother asserted that "her failure to visit the child was not willful because she had no transportation, multiple DCS workers, and no visitations scheduled." The trial court was not, however, persuaded that her failure to visit was not willful. Instead, the trial court concluded that DCS proved by clear and convincing evidence that Mother abandoned Bentley by failure to visit. In reaching this conclusion, the trial court found as follows:

Testimony indicated that the line of communication between DCS and [Mother] was very open, and that [Mother] had constant communication with her case managers. There were discussions regarding scheduling visits; however, DCS requested [Mother] to report for numerous drug screens. [Mother] made numerous excuses and failed to report for those requested screens, and no visitation was scheduled. At all times, [Mother] had the opportunity to visit. In fact, when [Mother] did request visitation, a visit was immediately scheduled.

Moreover, [Mother] used marijuana the entire time this child has been in state's custody. She somehow found the money to purchase marijuana; this money could have been used to secure transportation had she not been avoiding drug tests. [Mother] visited the child on two occasions during the custodial episode: one in September 2023 and again on March 18, 2024, during the relevant lookback period. The Court finds that [Mother] has exercised only token visitation.

Regarding the termination ground of abandonment by failure to support, the trial court found as follows:

Again, the relevant lookback is between the dates of February 7, 2024, and May 6, 2024. [Mother] was ordered to pay child support in the amount of $60.00 per month (Exhibit 6). During the relevant lookback period, [Mother] made a $10.00 payment on February 22, 2024, and another payment of $10.00 on April 9, 2024, for a total of two payments equaling $20.00 in support during the relevant period and constitutes only token support.

The trial court noted that Mother asserted that her "failure to support was not willful due to her pregnancy and lack of transportation." The trial court was not, however, persuaded that her failure to visit was not willful. Instead, the trial court concluded that DCS proved by clear and convincing evidence that Mother abandoned Bentley by failure to support. In reaching this conclusion, the trial court found as follows:

[Mother] has not worked during this entire custodial episode and admitted to smoking marijuana for most of it. In fact, her continued use of marijuana while pregnant with the child's younger half-sibling led to [his] removal into state's custody. [Mother] also testified that she lost an employment opportunity . . . due to a failed drug screen for marijuana.

. . . However, [Mother] admitted to going to different places, such as Gatlinburg and Jefferson City, and relying on others to take her. [Mother] also found a way to buy marijuana during the entire custodial episode, including while she was pregnant. There is nothing in the record to indicate that [Mother] was unable to work or have found the money to pay child support.

Having found statutory grounds for termination of parental rights, the trial court proceeded to consider the statutory best interest factors to determine whether Mother's parental rights should be terminated. The trial court concluded that 16 factors supported termination and that 4 did not. Having considered all of the statutory factors, the trial court concluded that there was clear and convincing evidence that the termination of Mother's

parental rights was in Bentley's best interest. Accordingly, the court terminated Mother's parental rights to Bentley. Mother appeals.

## II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)–(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.

The trial court found DCS presented clear and convincing evidence that established two grounds for terminating Mother's parental rights: abandonment by failure to visit and abandonment by failure to support. On appeal, Mother challenges the trial court's determinations with respect to both termination grounds. We address each in turn.

### A. Abandonment by Failure to Visit

First, the trial court found that DCS presented clear and convincing evidence that Mother abandoned Bentley by failing to visit him. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2023, to June 30, 2024).[4] If a child is under the age of four, abandonment occurs when a parent fails to visit "for a period of three (3) consecutive months immediately preceding the filing of a" termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i)(b) (effective July 1, 2023, to June 30, 2024). Failure to visit means "the failure, for the applicable time period, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Additionally, "'token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). The trial court found that Mother visited Bentley one time during the relevant lookback period but found this exercise to be only token visitation. That determination is supported by clear and convincing evidence in the record.

The record plainly supports that the visitation in this case was only token, and Mother does not argue to the contrary. Instead, Mother challenges the trial court's determination that her failure to visit was willful.[5] Tennessee Code Annotated § 36-1-102(1)(I) states:

> [I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence.

Specifically, Mother contends that she "did not fail to visit with [the] children between February 7, 2024, and May 6, 2024, because [she] attended every visitation set up by DCS, maintained contact with DCS, and asked DCS for additional visitation that was ignored."

---

[4] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

[5] There was no answer filed to the Petition to Terminate Parental Rights; however, the trial court addressed the affirmative defense of willfulness in its order, and DCS did not object to evidence of willfulness introduced at trial, nor did it argue Mother waived this issue in its briefing. Thus, we will treat it as properly raised for the purpose of this appeal. *See In re Brian W.,* No. M2020-00172-COA-R3-PT, 2020 WL 6390132, at *4 n.2 (Tenn. Ct. App. Oct. 30, 2020) ("A thorough examination of the record, however, shows that DCS did not object when Mother and Father introduced evidence regarding 'willfulness' at trial nor did they bring this issue to the juvenile court's attention after the court entered the termination order which clearly considered the parents' willfulness argument. Thus, the issue of 'willfulness' was tried by consent."); *see also* Tenn R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

"A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempt to visit the child." *In re M.L.P.*, 281 S.W.3d at 393. The trial court found Mother had open and consistent communication with DCS and her case managers. The court also found that whenever potential visits were discussed, she failed to report to the required drug screenings, often making excuses, which led to no visits being scheduled. Indeed, "[a]t all times, [Mother] had the opportunity to visit. In fact, when [Mother] did request visitation, a visit was immediately scheduled."

While there was a delay on one occasion in response to Mother's February 27, 2024 request for a visit due to a planned foster family vacation, which meant that visit did not occur until March 18, 2024, the record supports the trial court's conclusion that Mother did not prove that her failure to visit was not willful. DCS worked to support visitation when Mother sought it, but Mother would disappear or be non-responsive for extended periods of time. Although Mother tested positive for THC on March 18, 2024, during her only visit with Bentley within the statutory window, DCS nevertheless permitted the March 18 visit to proceed, and DCS was willing to facilitate subsequent visitation despite the failed drug test. DCS never denied a visitation request throughout the entire custodial period. In other words, Mother failed to be responsive to DCS trying to facilitate visitation, failed to actively seek visitation herself, and prioritized continuing drug use and evasion of testing over visitation with Bentley. DCS did not prevent Mother from visiting with Bentley, nor was there significant restraint or interference with her attempt to visit him. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020).

Mother also claims she did not have the resources to appear for any drug test since she did not have a vehicle nor a license, but Mother admitted that she knew public transportation was an option and testified that friends and her boyfriend's grandfather frequently gave her rides. The trial court found she had disposable income for marijuana that could have been used for transportation. The trial court found, and the record supports, that Mother had the opportunity to visit Bentley and simply failed to do so.

From our review of the record, the trial court did not err in concluding that DCS presented clear and convincing evidence that Mother abandoned Bentley by failure to visit. Similarly, the record supports the trial court's conclusion that Mother did not meet her burden as to the affirmative defense of lack of willfulness. Accordingly, the trial court did not err in finding that Mother abandoned Bentley by failure to visit.

B. Abandonment by Failure to Support

The trial court also found that Mother abandoned Bentley by failing to support him. Failure to support is defined as "the failure, for the applicable time period, to provide

monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). However, the absence of willfulness is also a defense to this ground for termination. Tenn. Code Ann. § 36-1-102(1)(I).

With regard to child support, Mother made two payments of $10 each during the relevant statutory period for which she was ordered to make payments totaling $180. The trial court found the two payments of $10 during the relevant lookback period to be token support.

On appeal, Mother does not dispute that the amount provided was token but instead asserts that her failure to support was not willful. Mother contends that she was not employed during the relevant period and "therefore did not have the ability to pay child support during that time." She also notes she was pregnant during the relevant period and that "she did not want to work in a factory while pregnant." She claims that "it is not willfully failing to support a child by refusing to work in a factory in a woman's third trimester," and since she "was a few months away from giving birth, she was not an attractive hire for any type of employment she was qualified to obtain."

The trial court was unpersuaded that Mother could not provide child support. The court noted that Mother managed to go on trips and obtained money to pay for her marijuana habit. The trial court also concluded that Mother was able to work. Ultimately, the trial court concluded that Mother did not prove a lack of willfulness in failing to come up with the money for child support.

In reviewing the record, Mother failed to work for the entirety of the 19-month time between Bentley's removal from her custody and the trial in this case. Mother was able to obtain money, but instead of using these funds to support Bentley, Mother used the money that she obtained to maintain her marijuana habit. Mother conceded that this marijuana habit had cost her a job and interfered with her ability to obtain employment. The trial court did not err in concluding that Mother failed to prove that her failure to support was not willful.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown against Mother by clear and convincing evidence, our focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then

consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the

basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective July 1, 2023, to June 30, 2024).

With regard to these factors, the trial court found the following:

(A) Bentley was five months old when he was removed into state's custody and has been in the same foster home for the past nineteen months. His foster home is the only home that he has had for the majority of his life. This factor weighs heavily in favor of terminating the parental rights of [Mother].

(B) Although the child has no medical concerns, a change in caretakers at this time would likely be detrimental to the child's emotional and psychological welfare. This factor weighs heavily in favor of terminating the parental rights of [Mother].

(C) [Mother] has not demonstrated any ability meet the child's basic material, educational, housing, and safety needs. Throughout most of this custodial episode, [Mother]'s housing has been incredibly unstable, as she stated that she lived place to place with others. This factor weighs very heavily in terminating the parental rights of [Mother].

(D) [Mother] had only two visits with the child during the past nineteen months; one lasting only an hour, and the other for only two hours. The Court finds that there is not a secure and healthy parental attachment between the child and [Mother]. The testimony reflects that Bentley does not or would not recognize [Mother] as his mother, and he refers to his foster parents as "Mommy" and "Daddy." This factor weighs in favor of terminating the parental rights of [Mother].

(E) [Mother] participated in only two visits with Bentley during this custodial episode. This factor weighs very heavily in favor of terminating the parental rights of [Mother].

(F) The Court does not consider this factor in its analysis.

(G) The Court does not consider this factor in its analysis.

(H) The child has created a healthy parental attachment with his foster parents, and this factor weighs in favor of terminating the parental rights of [Mother].

(I) Bentley's younger half-sibling is also placed in this foster home, along with the foster Parents' three biological children. The testimony indicates that the child is bonded with the children in the home, and this factor weighs in favor of terminating the parental rights of [Mother].

(J) Here, the Court finds that [Mother] continued to use marijuana throughout almost the entire custodial episode. The evidence shows that she gave birth to another child and used marijuana throughout the pregnancy. [Mother] has also remained unemployed and has a series of boyfriends with repeated domestic violence issues. This factor weighs in favor of terminating the parental rights of [Mother].

(K) and (L) [Mother]'s testimony is that she completed a victim's domestic violence course, attended some parenting classes, and completed an alcohol and drug assessment. While the record does not reflect any evidence of that, the Court gives some credence to her assertions and commends her those efforts. DCS attempted to assist her with numerous other things to no avail. Despite reasonable efforts made by DCS to assist [Mother] in making a lasting adjustment to her circumstances, such as entering case services requests to fund and provide for classes or other requirements on the permanency plan, [Mother] has failed to make a lasting adjustment of her circumstances, conduct, or conditions. These factors weigh in favor of terminating the parental rights of [Mother].

(M) The child has been in state's custody for nineteen months, and [Mother] has not addressed her marijuana use or unemployment. [Mother]'s statements today about the paternity of the child [are] inconsistent with her assertions at the time of the child's removal, and there has been no effort to establish paternity. This factor weighs in favor of terminating the parental rights of [Mother].

- 14 -

(N) [Mother] stated that she had several past boyfriends that were abusive to her. This factor weighs in favor of terminating the parental rights of [Mother].

(O) The child was removed from [Mother]'s custody at a very young age, and his half-sibling was removed at birth. [Mother] has never provided a stable home for her children. This factor weighs in favor of terminating the parental rights of [Mother].

(P) The Court finds that there is nothing in the record to suggest that [Mother] has demonstrated an understanding of the needs of the child or, particularly, what it takes to support this child. This factor weighs in favor of terminating the parental rights of [Mother].

(Q) [Mother]'s housing situation has been unstable during this entire custodial episode, except for perhaps until just very recently. She has not demonstrated the ability and commitment to creating and maintaining a home that would be safe and appropriate to where this child could thrive. This factor weighs in favor of terminating the parental rights of [Mother].

(R) The Court does not consider this factor in its analysis.

(S) [Mother] has paid nothing more than token child support. This factor weighs in favor of terminating the parental rights of [Mother].

(T) The Court does not consider this factor in its analysis.

The trial court concluded that 16 of the 20 statutory factors weighed in favor of terminating Mother's parental rights. The trial court also ultimately concluded that by clear and convincing evidence termination of Mother's parental rights was in Bentley's best interest.

On appeal, Mother argues that the trial court erred in concluding that termination is in Bentley's best interest. Mother advances five major arguments in support of her contention. One, Mother argues that she visited Bentley and is not at fault for failing to visit with Bentley more often; rather, she attributes the fault for any deficiency in visitation entirely to DCS. Two, Mother contends that she paid child support to the best of her ability. Three, Mother asserts that shortly before trial she moved into stable housing, stopped using marijuana, and received a job offer for employment out-of-state with a family member. Accordingly, she asserts she can now meet Bentley's needs. Four, Mother notes that she may regain custody of Bentley's half-brother Kamdyn with whom Bentley has an

important relationship and that termination of her parental rights could be harmful to this relationship. Five, Mother asserts that she loves Bentley.

Mother does not specify which particular of the aforementioned arguments relate to which particular statutory factors or argue for why other factors not delineated among the statutory factors are appropriate for consideration in the context of the present case. In considering Mother's arguments, we have endeavored to consider her contentions in relation to statutory factors that correspond therewith in the context of the present case.

Mother's first argument — she visited with Bentley and DCS is at fault for any deficiency in visitation — appears to push upon the trial court's findings in relation to Tennessee Code Annotated section 36-1-113(i)(1)(E). Factor (E) is addressed to considering "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child." Bentley was five months old when he was removed from Mother's custody. During the nineteenth months between Bentley's removal and trial, Mother visited Bentley twice. These two visits lasted for a total of three hours during this nineteenth month period. Mother engaged in no additional electronic visitation by phone or video. She also provided no cards or gifts. Bentley does not know Mother as his mother and instead identifies his foster parents as "mama" and "daddy." Simply stated, Mother is a stranger to Bentley. The trial court concluded, and the record supports, that the fault for Mother's failure to visit Bentley and to cultivate a positive relationship with him is with Mother. Based upon our review of the record, the trial court did not err in finding that factor (E) weighs in favor of termination of Mother's parental rights.

Mother's second argument — that she paid child support to the extent she could — appears to challenge the trial court's findings in relation to Tennessee Code Annotated section 36-1-113(i)(1)(S). Factor (S) is addressed to considering "[w]hether the parent has consistently provided more than token financial support for the child." Over the course of nineteenth months between removal and trial, Mother provided a total of $214 dollars in child support, translating to approximately eleven dollars a month. During much of that period, Mother was fully capable of working and failed to do so. Mother went on trips, and Mother obtained money that she elected to use to maintain her marijuana habit rather than to support her child. Mother conceded that her continued use of marijuana interfered with her ability to obtain employment and, specifically, conceded that she lost an employment opportunity because of her drug use. Based upon our review of the record, the trial court did not err in finding that factor (S) weights in favor of termination of Mother's parental rights.

Mother's third argument — that she has changed and now has stable housing, is not using drugs, and will obtain a job — appears to be tied to the trial court's analysis of Tennessee Code Annotated section 36-1-113(i)(1)(J), (K), and (R):

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions; . . .

(R) Whether the physical environment of the parent's home is healthy and safe for the child . . . .

The trial court found that Mother "failed to make a lasting adjustment of her circumstances, conduct, or conditions." During the nineteenth months between removal and trial, instead of prioritizing visitation with her son and resolving the conditions that led to his removal, which included her drug use, Mother continued to use drugs. Mother also failed to cooperate with DCS in allowing examination of locations where she was residing. Mother did not obtain employment at any point during the nineteenth months between removal and trial despite being capable of working. When DCS tried to help Mother with obtaining employment, she declined to cooperate with DCS. Mother asserted at trial, however, that she had changed. The trial court's findings reflect consideration of the testimony as to Mother's conduct over the course of nineteenth months between removal and trial and the trial court's skepticism as to Mother's testimony related to last minute changes on the eve of trial. The trial court plainly was unpersuaded that these were lasting changes. Furthermore, Mother was not cooperative with DCS in facilitating verification to support Mother's contention that she had made these changes. From our review of the record, we do not find that trial court's conclusions in relation to these factors to be in error.

Mother's fourth argument — that she may regain custody someday of Bentley's half-brother Kamdyn, with whom Bentley has a close relationship — presents a thoughtful push upon the trial court's conclusions in relation to factor (I). Tennessee Code Annotated section 36-1-113(i)(1)(I) involves consideration of "[w]hether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage." Mother contends that, because DCS has not filed for the termination of Mother's parental rights with respect to Kamdyn, if she were able to regain custody of Kamdyn, termination of her parental rights as to Bentley would sever that bond to Bentley's detriment. Mother does not have custody of Kamdyn; rather, Bentley's foster parents have custody of Kamdyn. Mother's parental rights as Kamdyn have not, however, been terminated nor from the

- 17 -

record before us does it appear that DCS has sought to terminate Mother's parental rights as to Kamdyn. These circumstances complicate the analysis of the sibling relationships implicated by factor (I). The trial court's conclusion, however, that factor (I) weighs in favor of termination was not only predicated upon Bentley's relationship with Kamdyn but also his relationship with his foster parent's three other biological children. The trial court concluded that Bentley bonded with his three foster siblings. Consequently, assuming arguendo that the uncertainty as to Kamdyn's status prevents reliance thereupon in finding that factor (I) weighs for or against termination, Bentley's familial bond with his three foster siblings, nevertheless, could potentially favor termination of Mother's parental rights under factor (I). However, from our review of the record, the testimony did not appear to specifically address Bentley's relationship with his foster siblings. Accordingly, the trial court's conclusion that factor (I) favors termination rests on shaky grounds. Factor (I) is, perhaps, best understood, given the record in this case, as neutral, rather than favoring termination.

Mother's fifth argument is that she loves Bentley. We do not doubt that Mother loves Bentley or even that maintaining the parent-child relationship with Bentley may be in Mother's best interest. The General Assembly, however, has charged trial courts in parental termination cases with assessing the best interest of the child — Bentley's best interest, not Mother's best interest. Tennessee Code Annotated section 36-1-113(i)(1); *see also*, *e.g.*, *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at \*12 (Tenn. Ct. App. Feb. 28, 2023). This court is then charged with reviewing that determination. As noted by the trial court, Bentley does not have a secure and healthy parental attachment to Mother. Tenn. Code Ann. § 36-1-113(i)(1)(D) (providing for considering "[w]hether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment"). Mother failed to maintain visitation with him beyond three hours over the course of nineteen months and hence is a stranger to Bentley. Tenn. Code Ann. § 36-1-113(i)(1)(E) (setting forth as a factor "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child"). Bentley has, however, developed a healthy parental attachment with his foster parents, who wish to adopt him and whom he calls "mama" and "daddy." Tenn. Code Ann. § 36-1-113(i)(1)(H) (establishing as a factor in assessing best interest of the child "[w]hether the child has created a healthy parental attachment with another person or persons in the absence of the parent"). While as noted above we do not doubt that Mother loves Bentley, the trial court did not err in its consideration of the parental relational bonds in the present case as supporting termination.

In considering whether to terminate parental rights, the determination of a child's best interest "may not be reduced to a simple tallying of the factors for and against termination." *See In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at \*15 (Tenn. Ct. App. May 15, 2023). Rather, a court must determine, after completing a holistic assessment of the record, whether terminating a particular parent's rights would be

in a particular child's best interest. *Id.* This court has repeatedly indicated that "[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020).[6]

In the present case, while there are individual factors as to which the trial court's analysis could be questioned, the correctness of the trial court's ultimate assessment and the thrust of its analysis is well-reasoned and plainly supported by the record. The trial court engaged in a thoughtful assessment of the circumstances of the present case in light of the statutory factors delineated by the Tennessee General Assembly. In this case, Mother demonstrated little urgency or follow-through in addressing the conditions that led to her child's removal. Despite being given numerous opportunities and support from DCS, she failed to maintain visitation with her child, seeing him twice for a total of three hours over the course of nineteen months. Mother consistently prioritized her continuing drug use over being with Bentley. She failed to obtain employment over the entire nineteen-month period between removal and trial. She used the money that she did obtain to support her drug habit rather than to support her child. Bentley does not have a secure and healthy parental attachment to Mother. She is a stranger to him. Alternatively, Bentley has formed a healthy parental attachment with foster parents, who wish to adopt him. From our review of the record, we conclude that clear and convincing evidence exists supporting the trial court's conclusion that termination of Mother's parental rights is in Bentley's best interests.

V.

For the aforementioned reasons, we affirm the judgment of the Juvenile Court of Grainger County, terminating Emaleigh W.'s parental rights. Costs of this appeal are taxed to the Appellant, Emaleigh W., for which execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE

---

[6] *See also, e.g.*, *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *11 (Tenn. Ct. App. Feb. 28, 2023); *In re Charles B.*, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021); *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL 5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).